**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING** |
| | ) | **MOTIONS TO SUPPRESS** |
| vs. | ) | |
| | ) | |
| Tradvis Demarr Williams and | ) | Case No. 1:22-cr-228 |
| Kristen Kay Fast, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is Tradvis Williams's motion to suppress filed on September 22, 2023. See Doc. No. 80. The Government filed a response in opposition to the motion on October 6, 2023. See Doc. No. 86. On October 6, 2023, Defendant Kristen Fast joined in the motion. See Doc. No. 84. The Government filed a response in opposition to Fast's motion on October 19, 2023. See Doc. No. 90. Williams filed a reply on December 29, 2023. See Doc. No. 103. A hearing on the motions was held on February 1, 2024. The Government filed a post-hearing brief on February 16, 2024. See Doc. No. 113. Williams and Fast filed post-hearing briefs on February 16, 2024. See Doc. Nos. 115 and 116. For the reasons set forth below, the motions are denied.

I.      **BACKGROUND**

The Court held a suppression hearing on February 1, 2024. Four law enforcement officers testified at the hearing: Special Agents Gregory Brugh, Jr., Dawn White, and Duane Bowen from the Mandan Hidatsa and Arikara Division of Drug Enforcement ("MHA-DDE") and Corporal Samuel Sorenson from the McKenzie County Sherriff's Department. The factual background is derived from their testimony, as well as the law enforcement reports, affidavits, bodycam footage, and other documentation in the record.

On November 22, 2022, around 11:00 p.m., Brent and Toni Vandall advised Agent Brugh via telephone of suspicious activity occurring at a residence next to theirs within the Thunder Butte housing area in the Four Bears Segment of the Fort Berthold reservation. Toni Vandall reported that she observed a black male wearing a grey hooded sweatshirt and dark sweatpants come out of the front door of William Stevens ("Stevens") and Mariah Levings's ("Levings") residence. Toni Vandall advised Agent Brugh that she had not seen Steven or Levings at the residence in weeks and was informed by Steven's mother that Stevens does not stay there and no one should be at the residence. Toni Vandall asked Agent Brugh to drive around and check out the area. Agent Brugh went in an unmarked patrol car and parked near the Stevens residence to observe it. Agent Brugh knew the layout of the house because he had previously been inside. He observed that lights were on inside the house and then turned off. He noticed movement in the master bedroom of the residence. Agent Brugh testified that he saw the porch lights flick on and off as if someone was signaling. He then observed an individual, who was later identified as Tradvis Williams, exit the house through the front door with a flashlight. Williams began to walk toward the unmarked patrol car. Williams was wearing a grey hooded sweatshirt and dark sweatpants, which matched the description Toni Vandall gave of the individual wandering near the Stevens' residence.

Agent Brugh activated the emergency lights inside his patrol car for about one minute to get Williams's attention. He stepped out of the vehicle, approached Williams, and identified himself as a law enforcement officer with MHA drug enforcement. Agent Brugh asked Williams for his name, date of birth, and identification. Williams stated his name was "Travis Williams," provided his date of birth, and stated he did not have identification with him. Agent Brugh provided this information to dispatch. While waiting for a response from dispatch Agent Brugh asked Williams what he was doing at the Stevens residence. He told Agent Brugh that he was a carpenter

and was completing renovations on the house. Agent Brugh informed Williams he had been advised that no one should be at the home. Williams explained he was dropped off by "Mathias and William." Agent Brugh was familiar with Mathias Mariner and William Stevens and was aware from past experience that both individuals were opiate users who had housed suppliers of drugs at various locations on the Fort Berthold Reservation.

No results were found when running the information Williams gave through dispatch. Agent Brugh then asked Williams if he went by another name and Williams gave the name "Travis Lamar Williams" and the same date of birth. Agent Brugh advised dispatch of the new information. He took a photograph of Williams and sent it to other MHA-DDE agents in case they could identify him. Agent Brugh again asked Williams what he was doing at the house. Williams again stated he was doing carpentry work and remodeling the house. Williams said Stevens gave him permission to stay in the house while he completed the work. Agent Brugh then informed Williams of recent drug activity that occurred at the house. Williams told Agent Brugh he could go into the house to look around and would not find any drugs. Throughout this interaction, Williams was talking on his cell phone to his girlfriend, whom he indicated was in the Stevens residence. He told Agent Brugh her name was "Kristen McPherson."

As this conversation occurred, Agent White responded with a mugshot photograph of Williams with the name "Tradvis Demarr Williams," the date of birth he provided, and a list of identifiers that matched Williams. Agent Brugh again asked Williams his name. This time Williams said his name was "Tradvis Williams." He informed Agent Brugh that he was on probation and was not supposed to leave Michigan. Upon verification that Williams provided a false name, Agent Brugh handcuffed Williams and placed him in his patrol car to wait for

McKenzie County Sheriff's deputies to arrive since William was not an enrolled member of the tribe.

After placing Williams in the patrol car, Three Affiliated Tribes ("T.A.T") Law Enforcement Officers and Agent White arrived on scene. Agent White asked officers if Williams had been advised of his *Miranda* rights and did not get a clear response. She then advised Williams of his *Miranda* rights, introduced herself, and then asked Williams a few brief questions. She asked Williams about his name and why he was at the Stevens residence. Williams told Agent White he had permission from Stevens to stay at the house while completing carpentry work. He told Agent White his girlfriend, "Kristen McPherson" was inside the house. Agent White noted Williams's hands were not rough, calloused, and bruised, which she testified are typical characteristics of carpenters because of the work they complete with their hands. Agent White testified that she talked to Williams for approximately two to three minutes. Agent White and Agent Brugh then approached the Stevens residence with MHA-DDE agents and T.AT. agents. Agent White knocked on the door and Kristen Fast answered. Agent White introduced herself and advised Fast why she was there. When Agent White asked Fast if she was Kristen McPherson, Fast answered in the affirmative. Agent White testified that she asked Fast if officers could come in to ensure the residence was secure and Fast said "yes". At some point during the search McKenzie County Sherriff's Deputies arrived on scene.

The residence was messy, there was trash in several places, and no remodeling work was being completed. Officers did not find any carpentry tools or remodeling supplies. The officers did not observe any suitcases, duffle bags, or backpacks. The only bag agents saw in the house was a cloth bag belonging to Fast, which was the size of a purse.

As the officers checked the residence Agent Bowen observed a piece of tin foil with black burn trail marks, which he recognized to be paraphernalia used to ingest opiates. The tin foil was sitting on a bookshelf in an open closet in the master bedroom where Agent Brugh had observed movement and lights prior to the entry into the residence. Agent Bowen also found a plastic smoking device when he turned over the mattress in the bedroom. Agent Bowen testified that he moved the mattress during the protective sweep due to his training, which taught him to move mattresses in scenarios such as this to ensure an individual is not hiding behind the mattress.

While the officers searched the residence, Fast asked Agent White for an article of clothing from her bag. Agent White asked Fast if officers could first check her bag and Fast said, "yes". While searching the bag Agent Brugh observed a hotel receipt for the Wingate Hotel in Bismarck in the name of Kristen Fast. Agent Brugh showed Agent White the receipt and confirmed with Fast that her name was "Kristen Fast" rather than "Kristen McPherson." Fast was then detained and Agent White advised Fast of her *Miranda* rights. Thereafter, officers learned that she was a parole absconder from Michigan.

MHA-DDE agents provided information to Bismarck drug agents about the hotel room that Fast had a receipt for. Bismarck Police Detective Jerry Stein contacted the Wingate Hotel in Bismarck and confirmed Fast and Williams were staying in room 210. A narcotics detection canine alerted on room 210 for the presence of narcotics. Following the alert by the canine, Detective Stein obtained a search warrant for the hotel room. During the search of the hotel room officers located over 1,200 fentanyl pills.

On December 7, 2022, Williams and Fast were indicted in federal court. See Doc. No. 1. The indictment charges Williams and Fast with one count of conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B) and one count of possession with intent to distribute fentanyl (40 grams or more –

mixture) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2.

II.     **LEGAL DISCUSSION**

    A.  **MIRANDA WARNING**

Williams contends law enforcement's failure to read him *Miranda* rights before asking

questions pertaining to his identity and his presence at the residence violated the Fifth Amendment.

The Government maintains a *Miranda* warning was not necessary because Agent Brugh's initial

interaction with Williams was a consensual encounter. The Government argues that even if Agent

Brugh's initial encounter with Williams constituted a detention, a *Miranda* warning was not

required because the temporary seizure constituted a *Terry* stop. Fast argues in her memorandum

in support of her motion that the encounter with Williams was a violation of the Fourth

Amendment because SA Brugh lacked reasonable suspicion to stop Williams. Fourth Amendment

rights are personal and may not be asserted vicariously. United States v. Wright, 844 F.3d 759,

762 (8th Cir. 2016). Accordingly, Fast lacks standing to challenge Agent Brugh's encounter with

Williams.

The Fifth Amendment of the United States Constitution provides a privilege against self-

incrimination. Given this Fifth Amendment privilege, certain procedural safeguards must be

employed prior to the interrogation of an individual by law enforcement officers. Miranda v.

Arizona, 384 U.S. 436, 444 (1966).  Individuals must be informed of their (1) right to remain silent,

(2) any statements made can be used against them at trial, (3) the right to have an attorney present

during questioning, and (4) if an attorney is not affordable, one will be appointed.  Id. at 478-79.

"*Miranda* warnings are required when a suspect is interrogated while in custody."  United States

v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011).

A police officer may conduct a brief, warrantless stop of a person if he reasonably believes

that person is involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 20-22 (1968). The police

officer must be able to point to "specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant that intrusion." Id. at 21. An officer may rely upon

information discovered by other officers as well as information known to officers as part of an

investigation to justify a warrantless stop. United States v. Gordon, 741 F.3d 872, 876 (8th Cir.

2013) (citing United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003)). A police officer

with a reasonable suspicion of criminal activity may briefly detain a person for questioning.  Terry,

392 U.S. at 10.

For purposes of *Miranda*, an individual is in custody when he is either formally arrested or

his freedom of movement is constrained to a degree equivalent with formal arrest.  United States

v. Brave Heart, 397 F.3d 1035, 1038 (8th Cir. 2005). In *United States v. Pelayo-Ruelas*, the Eighth

Circuit Court of Appeals discussed the interaction between the custodial interrogation principle of

*Miranda* and the brief-detention-to-investigate principle of *Terry*. 345 F.3d 589 (8th Cir. 2003).

> 'The [*Terry*] stop and inquiry must be reasonably related in scope to the justification
> for their initiation. Typically, this means that the officer may ask the detainee a
> moderate number of questions to determine his identity and to try to obtain
> information confirming or dispelling the officer's suspicions. But the detainee is not
> obliged to respond. And, unless the detainee's answers provide the officer with
> probable cause to arrest him, he must then be released. The comparatively
> nonthreatening character of detentions of this sort explains the absence of any
> suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*.
> The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that
> persons temporarily detained pursuant to such stops are not 'in custody' for the
> purpose of *Miranda*.'

Id. at 592 (citing to *Berkemer v. McCarty*, 468 U.S. 420, 439–40, (1984)). The court explained, "No *Miranda* warning is necessary for persons detained for a *Terry* stop. Thus, we reject as contrary to this controlling authority [the defendant's] broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave. One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights." This Court reached the same conclusion in *United States v. Torres-Monje*, 433 F. Supp. 2d 1028, 1035 (D.N.D. 2006). *Miranda* warnings are not generally needed for persons subject to a *Terry* stop. Id.

Williams argues the encounter with Agent Brugh was a custodial interrogation based on an inarticulable hunch. The testimony at the suppression hearing revealed Agent Brugh knew the Steven's residence was not currently occupied by the owners, based on the information provided by Toni Vandall. Toni Vandall further informed Agent Brugh that she saw a black male wearing a grey hooded sweatshirt and dark sweatpants come out of the residence and go back in. Agent Brugh observed lights being turned on and off, movement in the master bedroom, and porch lights flickering as if signaling. He then observed Williams, who matched the description provided by Toni Vandall, exit the house with a flashlight. Based on these specific and articulable facts, taken together with reasonable inferences from the facts, Agent Brugh had reasonable suspicion to briefly detain Williams and to obtain information confirming or dispelling his suspicions of trespassing. Agent Brugh was justified in asking questions to determine William's identity and why he was at the residence. These few questions fall well within the parameters of a *Terry* stop. Because the encounter constituted a *Terry* stop, *Miranda* warnings were not required. During this interaction Williams provided a false name to Brugh, which justified later detaining him until county officials arrived to arrest him. Williams argues he was detained and interrogated by Agent

White without the benefit of *Miranda* warnings. However, Agent White testified that once she arrived on scene she advised Williams of his *Miranda* rights prior to introducing herself and asking any questions. Therefore, Williams's Fifth Amendment rights were not violated.

## B.  SEARCH OF THE RESIDENCE

Williams argues the warrantless search of the residence was unconstitutional. The Government asserts Williams and Fast lack standing to challenge the alleged search of the residence because they had no expectation of privacy in the residence. Further, the Government argues if the Court finds Williams and Fast had a reasonable expectation of privacy in the home, suppression is not warranted because Williams and Fast both consented to the search of the home. Additionally, Fast consented to the search of her bag[1].

The Fourth Amendment secures the persons, houses, papers, and effects of the people against unreasonable searches and seizures by the government. U.S. Const. amend. IV. The general rule is that the government must secure a warrant before conducting a search. United States v. Alberts, 721 F.2d 636, 638 (8th Cir. 1983). "Warrantless searches are presumptively unreasonable absent some exception to the warrant requirement." United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003).

As a general rule, the burden of proof is on the defendant who claims a Fourth Amendment violation has occurred and seeks to suppress evidence. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984); United States v. Shipton, 5 F.4th 933, 936 (8th Cir. 2021). In the case of a warrantless search, the government bears the burden of establishing an exception to the warrant

---

[1] Williams does not assert the bag belonged to him or was controlled by him. Therefore, he has no expectation of privacy as to Fast's bag. Because Fourth Amendment rights are personal and cannot be asserted vicariously, Williams lacks standing to challenge the search of the bag.

requirement. Id.; United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005); United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004); United States v. Bruton, 647 F.2d 818 (8th Cir. 1981).

"The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995); United States v. Pierson, 219 F.3d 803, 806 (8th Cir. 2000); United States v. Gomez, 16 F.3d 254, 256 (8th Cir.1994). This test is often referred to as the *Katz* inquiry and involves two discrete questions. Smith v. Maryland, 442 U.S. 735, 740 (1979); Katz v. United States, 389 U.S. 347, 351-52 (1967). The defendant must demonstrate: (1) a subjective expectation of privacy in the place or objects searched, that is whether the person has demonstrated through his conduct that he seeks to preserve something as private; and (2) that the subjective expectation of privacy is one that society is prepared to recognize as objectively reasonable under the circumstances. Smith, 442 U.S. at 740; Muhammad, 58 F.3d at 355.

An overnight guest in a home has a legitimate expectation of privacy and may claim the protection of the Fourth Amendment. Minnesota v. Olson, 495 U.S. 91, 98-99, (1990). However, an individual who is merely present with the consent of the householder may not claim the protection of the Fourth Amendment. Minnesota v. Carter, 525 U.S. 83, 90 (1998). In *Carter*, the United States Supreme Court held that a search did not violate an individual's Fourth Amendment rights because the purely commercial nature of the transaction, the relatively short period of time on the premises, and the lack of any previous connection between the individual and the owner of the house led the Court to conclude that the situation was closer to that of one simply permitted on the premises rather than an overnight guest.

There was no evidence presented to support the Defendants' allegation that they had permission from the owners (Stevens and Levings) to stay in the home as overnights guests. In

fact, no evidence was presented to support the idea that the owners gave permission for the Defendants to be inside the home for any period of time. There is no evidence the Defendants had a previous relationship with Stevens of Levings. At the suppression hearing, testimony revealed that Williams and Fast did have not belongings in the house to support the contention that they were staying at the residence as overnight guests. The only bag in the house was Fast's bag, which Agent White described as a cloth bag that was the size of a purse. The agents did not observe any suitcases, duffle bags, backpacks, or any other personal property that would indicate Williams or Fast were overnight guests at the residence. Law enforcement officers testified that the house was a mess and trash was all over. There was no remodeling work, no sheet rock, and no carpentry tools or supplies to corroborate William's statement that he was completing carpentry or remodeling work at the residence. Further, when searching Fast's bag Agent Brugh found a hotel receipt for the night of the search for the Wingate Hotel in Bismarck, which indicates they were not staying at the residence. There is no credible evidence that there was any other purpose to the Defendants' visit than some type of "business transaction."

Williams's argument presents a contradiction. Although Williams argues he has standing to challenge the search because he had a reasonable expectation of privacy in the residence as an overnight guest, he also argues it was unreasonable for SA Brugh to believe that as a third party Williams had common authority over the residence and to rely on his consent. Williams's only evidence in support of his allegation that he was an overnight guest was the statement he made to SA Brugh informing him that he had permission from Stevens to stay at the residence. Williams argues the Court should conclude he was an overnight guest based only on this information while simultaneously concluding this information was insufficient for SA Brugh to determine Williams was an overnight guest that had common authority to consent to the search of the residence. By

arguing that the Defendants lacked authority to consent to a search of the residence, the Defendants are essentially acknowledging they do not have a reasonable expectation of privacy. The Court concludes the Defendants were not overnight guests based on the evidence presented. Williams and Fast did not have a reasonable expectation of privacy in the residence. Accordingly, the Defendants lack standing to challenge the search of the residence.

However, even if the Defendants have standing to challenge the search as overnight guests, suppression is not warranted because both Williams and Fast consented to the search of the residence. "Though police officers generally need a warrant to enter a home to search or make an arrest, they do not need one when someone possessing common authority over the home voluntarily consents to their entry." United States v. Cobo-Cobo, 873 F.3d 613, 615 (8th Cir. 2017). Common authority over premises exists where there is mutual use of the property by individuals with joint access or control. United States v. Matlock, 415 U.S. 164, 171 n.7 (1974). The authority to consent to a search of a general area extends to objects in plain view within the area. United States v. Wright, 971 F.2d 176 (8th Cir. 1992).

If Williams and Fast were overnight guests, that would provide sufficient common authority to grant consent to search the residence. During Agent Brugh and William's initial encounter Williams told Agent Brugh he could enter the residence and search it. Williams further stated Agent Brugh would not find drugs inside. Williams unequivocally consented to law enforcement entering and searching the residence. His consent was volunteered without any questioning or prodding by Agent Brugh. Williams does not argue that the consent was not voluntary. Williams's consent provides a proper basis for the warrantless search.

The evidence presented further reveals that Fast also consented to a search of the residence. Fast argues for the first time in her post-hearing brief that her consent to search the house was not

12

voluntary. The record does not support this contention. Agent White testified that Fast consented to officers searching the residence to ensure no one else was there. Further, a review of the T.A.T. agent's bodycam footage reveals that Fast consented to officers searching the residence. See Doc. No. 111. In the video footage, which starts after officers entered the residence, Agent White and Fast discussed why a chair was propped against the basement door. Id. at 1:15. Agent White then asked, "Is there anybody else in this home?" Fast responded, "Not that I know of." After Agent White expressed concern that someone else was in the house, the following exchange occurred:

> **AGENT WHITE:** Do you mind if Agent, if the agents --
>
> **FAST:** You may look through whatever you want.
>
> **AGENT WHITE:** If the agents go down to the basement to make sure.
>
> **FAST:** Yes.

Id. at 1:31-1:36. Although Agent White asked for consent to search the basement, Fast consented to a protective sweep of the entire house by stating, "You may look through whatever you want" before Agent White specified her request pertained to the basement. Although unclear whether this is the consent Agent White referred to in her testimony or whether Fast consented for a second time, the consent occurred before the officers observed drug paraphernalia and found the Wingate Hotel receipt. The Court concludes Fast voluntarily consented to the search. Even if Fast's consent was not voluntary, Williams had already consented to a search of the residence.

In her post-hearing brief Fast argues the consent she gave to search her bag was caused by Agent White forcing her to disrobe in the cold conditions. The bodycam video clearly contradicts this argument. At the 8:20 mark Agent Brugh is seen searching Fast's bag while Fast, who is still wearing her jacket, is seated in a chair next to him. After informing Fast she was to be detained, Agent White told Fast to take her jacket off at the 10:00 mark, which occurred after the search of

the bag. Thus, Fast's consent to search her bag occurred <u>before</u> Agent White told her to remove her jacket. Accordingly, the Court finds the protective sweep of the residence and the search of Fast's bag were lawful. Any suppression of evidence is unwarranted.

## III.   <u>CONCLUSION</u>

The Court has carefully reviewed the entire record, the parties' arguments, the evidence presented at the suppression hearing, and the relevant case law. For the reasons outlined above, the motions to supress (Doc. Nos. 80 and 84) are **DENIED**.

**IT IS SO ORDERED.**

Dated this 7th day of March, 2024.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court